MATTHEW J. MCKEOWN
Acting Assistant Attorney General
Environment and Natural Resources Division
Washington, DC 20530

ANGELA O'CONNELL
Senior Counsel
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6485
Fax: (415) 744-6476
E-mail: angela.o'connell@usdoj.gov

McGREGOR W. SCOTT
United States Attorney
E. ROBERT WRIGHT
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, California 95814
Tel: (916) 554-2700
Fax: (916) 554-2900

Attorneys for the Plaintiff United States
(Additional Attorneys Listed on Following Page)

## IN THE UNITED STATES DISTRICT COURT FOR
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, ex rel., the CALIFORNIA DEPARTMENT OF FISH AND GAME, the CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, SAN FRANCISCO BAY REGION, and the CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, LAHONTAN REGION**<br><br>Plaintiffs,<br><br>v.<br><br>**KINDER MORGAN ENERGY PARTNERS, L.P., and SFPP L.P.,**<br><br>Defendants. | ) ) ) ) ) **Civil Action No.** ) **2:07-00952-GEB-EFB** ) ) **AMENDED** ) **CONSENT DECREE** ) ) ) ) ) ) ) ) ) ) |

EDMUND G. BROWN JR.
Attorney General of the State of California

ANITA E. RUUD
Deputy Attorney General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Tel: (415) 703-5533
Fax: (415) 703-5480

Attorneys for Plaintiffs California Regional Water
          Quality Control Board, San Francisco Bay
          Region and California Regional Water Quality
          Control Board, Lahontan Region

KATHERINE VERRUE-SLATER
Staff Counsel III
California Department of Fish and Game
Office of Spill Prevention and Response
1700 K Street, Suite 250
Sacramento, California 95814
Tel: (916) 324-9813
Fax: (916) 324-5662

STEPHEN SAWYER
Assistant Chief Counsel
California Department of Fish and Game
Office of Spill Prevention and Response
1700 K Street, Suite 250
Sacramento, California 95814
Tel: (916) 324-9812
Fax: (916) 324-5662

Attorneys for Plaintiff California
          Department of Fish and Game

**TABLE OF CONTENTS**

I.      JURISDICTION AND VENUE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 6 -

II.     APPLICABILITY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -

III.    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

IV.     CIVIL PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 11 -

V.      CDFG RESPONSE AND REMEDIATION MONITORING COSTS . . . . . . . . . . . - 15 -

VI.     NATURAL RESOURCE DAMAGES PAYMENTS . . . . . . . . . . . . . . . . . . . . . . . - 16 -

VII.    INJUNCTIVE RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 21 -

VIII.   STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 24 -

IX.     FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 28 -

X.      DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 29 -

XI.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS  . . . . . . . . . . . . . . . - 31 -

XII.    COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 32 -

XIII.   NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 33 -

XIV.    EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 34 -

XV.     RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 37 -

XVI.    MODIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 37 -

XVII.       TERMINATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 37 -

XVIII.      PUBLIC PARTICIPATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 38 -

XIX.    SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 38 -

XX.     INTEGRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 39 -

XXI.    FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 39 -

# CONSENT DECREE

A.      WHEREAS, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), the United Stated Department of the Interior ("DOI"), and the United States Department of Commerce, National Oceanic and Atmospheric Administration ("NOAA"), and the People of the State of California, *Ex Relatione* the California Department of Fish and Game ("CDFG"), the California Regional Water Quality Control Board, San Francisco Bay Region ("SFBRWQCB"), and the California Regional Water Quality Control Board, Lahontan Region ("LRWQCB") (collectively the "Plaintiffs"), have filed a Complaint in this action concurrently with this Consent Decree against Defendants Kinder Morgan Energy Partners, L.P. ("KMEP") and SFPP, L.P. ("SFPP"). The Complaint alleges that Defendants are civilly liable for penalties, injunctive relief, removal costs and damages under federal law pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., the federal Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq., and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 et seq., and under California law pursuant to the Porter Cologne Water Quality Control Act, California Water Code § 13000 et seq., the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Government Code § 8670.1 et seq., and the California Fish and Game Code, with respect to three separate discharges of oil from April 2004 to April 2005 from oil pipelines that Defendants own or operate, as further described herein;

B.      WHEREAS, on or about April 27, 2004, approximately 2,947 barrels of oil discharged from the Defendants' North Line pipeline into the Suisun Marsh and adjoining shorelines, near Suisun City, in Solano County, California (the "Suisun Discharge"). The Suisun Discharge resulted from external corrosion on the pipeline;

Consent Decree - 1

C.      WHEREAS, the Plaintiffs allege that on or about February 7, 2005, approximately 1,831 barrels of oil discharged from the Defendants' Brisbane Terminal-Oakland pipeline, reaching the Oakland Inner Harbor, near Oakland, in Alameda County, California (the "Oakland Discharge"). The Oakland Discharge resulted from longitudinally oriented gouges on the pipeline from excavation damage;

D.      WHEREAS, the Plaintiffs allege that on or about April 1, 2005, approximately 300 gallons of oil discharged from the Defendants' pipeline into Summit Creek and other waters of the United States in the Donner Lake watershed and adjoining shorelines, near Truckee, in Placer County, California (the "Donner Discharge"). The Donner Discharge likely resulted from dents on the pipeline or corrosion related to disbonded coating;

E.      WHEREAS, on or about September 2005, CDFG received from Defendants a Soil Assessment Report for the Donner Discharge that recommends natural attenuation and additional assessment of the soil conditions as the remedial alternatives;

F.      WHEREAS, CDFG agreed to allow some contamination from the Donner Discharge to remain in place subject to natural attenuation, provided that Defendants conduct continued sediment and water monitoring and, in the event that natural attenuation fails to remediate the remaining contamination, conduct alternative remediation and containment;

G.      WHEREAS, to resolve in accordance with this Consent Decree the claims asserted in the Complaint regarding the Suisun Discharge, the Oakland Discharge and the Donner Discharge, Defendants will pay the sum of three million, seven hundred and ninety-five thousand, one hundred and thirty-five dollars ($3,795,135.00) for civil penalties (at least $500,000.00 attributable to the Oakland Discharge), the sum of one hundred and eighteen

Consent Decree - 2

thousand and six hundred and sixteen dollars ($118,616.00) for remaining CDFG response costs
(Oakland = $56,956.00; Suisun = $39,194.00; Donner = $22,466.00), the sum of fifty-one
thousand and four hundred dollars ($51,400.00) for future remediation monitoring costs of
CDFG for the Donner Discharge, the sum of one million, one hundred and fifty-one thousand
and ninety-nine dollars ($1,151,099.00) related to the Suisun discharge for natural resource
damages, the sum of twenty-thousand dollars ($20,000.00) to the National Fish and Wildlife
Foundation to fund projects to restore resources damaged by the Donner Discharge, the sum of
sixteen thousand, ninety-nine dollars ($16,099.00) to NOAA for reimbursement of its Natural
Resource Damage Assessment costs associated with the Suisun Discharge, the sum of one
hundred forty-thousand four hundred and eighty-four dollars ($140,484.00) to the CDFG for
unreimbursed Natural Resource Damage Assessment costs incurred in connection with the
Suisun Discharge, and any reasonable unreimbursed Natural Resource Damage Assessment costs
incurred by DOI with respect to the Suisun Discharge, perform specified injunctive relief related
to enhancement of pipeline spill prevention and response preparation to prevent future violations
of the CWA, and satisfy all other terms of this Consent Decree.

H.      WHEREAS, Defendants have taken the following steps to decrease the likelihood
of other such discharges:

(1)      Installed new pipeline within the North Line system that avoids routing
through most of the Suisun Marsh;

(2)      In 2005, conducted a caliper in-line inspection and a high-resolution Axial
Flow Detection ("AFD") inspection survey of the entire Oakland to Brisbane 12" Pipeline, on
which the Oakland Discharge occurred.  The AFD tool had the magnetic field rotated 90 degrees,

Consent Decree - 3

which better enabled it to detect and identify axially oriented features that may be present in the pipeline. Based on data from the caliper and AFD inspections, Defendants excavated the pipeline at two dig locations to visually inspect for mechanical damage and repaired or replaced the pipeline at both of those locations;

(3)   Cut out a 14.5 ft. long section of pipeline at the location of the Donner Discharge and replaced with new pre-tested pipe;

(4)   Reviewed all data acquired during a 1997 in-line inspection ("ILI") survey of the entire 120 mile long pipeline system from Rocklin, California, to Reno, Nevada, on which the Donner Discharge occurred, to identify and size dents that might exist. The 1997 ILI surveys consisted of Electronic Geometry Pig surveys and Corrosion Detection Pig surveys. Pursuant to this review, Defendants identified anomalies at twenty locations, excavated nineteen of the locations to inspect for potential damage, determined that one anomaly had already been replaced due to a relocation project and repaired or replaced the pipe at fifteen of the locations. The balance of physically inspected pipe locations did not meet repair criteria and were recoated after inspection;

(5)   Performed high resolution caliper ILI surveys on the entire 120 mile long Rocklin to Reno pipeline system to better identify mechanical damage and corrosion. Defendants have excavated the pipeline for visual inspection in seventeen locations, which resulted in Defendants repairing or replacing the pipeline in at least twelve of those locations. Additionally, a high resolution Magnetic Flux Leakage Survey and Transverse Flux Inspection tools were run in November 2006;

(6)     Hired and trained at least ten (10) additional employees to be present at all excavations within 10 feet of the center line of any Pacific Operations Unit pipeline and incorporated this requirement for qualified inspector presence at excavations into its Integrity Management Plan;

(7)     Created a system to integrate and overlay all data for the entire Pacific Operations Unit from close interval surveys, ILI surveys, excavations, visual inspections and other pipeline integrity evaluation into a Pipeline Open Database System to identify areas along the pipeline system where corrosion, mechanical damage, disbonded coating or other anomalies might exist that require further investigation, repair or replacement to prevent future discharges;

(8)     Entered into a Consent Agreement with the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA"), in the matter of Kinder Morgan Energy Partners, L.P., CPF No. 5-2005-5025H (the "PHMSA Consent Agreement"), in which KMEP agreed to address integrity threats along the entire 3,900-mile Pacific Operations Unit to prevent failures, including failures caused by outside force damage and corrosion.  The specific terms of the agreement are set forth in the PHMSA Consent Agreement, a copy of which is attached hereto as Attachment A;

(9)     Established an internal company procedure to run the same quality ILI through each pipeline segment and apply the same dig criteria (for investigation and validation) and repair criteria for each portion of any pipeline segment regardless of whether an identified condition is in an area that is designated as "could affect an 'High Consequence Area'" within the meaning of 49 C.F.R. 195.452.

I.      WHEREAS, Defendants have revised their spill notification procedures in their spill response plans to improve the promptness of notification to federal and state authorities;

J.      WHEREAS, Defendants do not admit any liability to the Plaintiffs arising out of the transactions or occurrences alleged in the Complaint.

K.      WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before taking testimony and without the adjudication or admission of any issue of fact or law except as provided in Section I, below, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355 (original jurisdiction), Sections 1002(a), (b)(1)(A) and (b)(2)(A), 1006, 1017(b) of OPA, 33 U.S.C. §§ 2702(a), (b)(1)(A) & (b)(2)(A), 2706, and 2717(b), and Sections 309(b), 311(b)(7)(E) and 311(n) of the CWA, 33 U.S.C. §§ 1319(b), 1321(b)(7)(E) and 1321(n).  The Court has supplemental jurisdiction over the subject matter of the CDFG, SFBRWQCB and LRWQCB's claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to the federal claims that they form part of the same case or controversy.  This Court also has jurisdiction over the subject matter of the CDFG's OPA claim under 33 U.S.C. § 2717(b).  The Court has personal jurisdiction over the Parties to this Consent Decree.  Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b) and

1395(a), because the Defendants reside in this District as determined by 28 U.S.C. § 1391(c).

For the purposes of this Consent Decree, or any action to enforce this Consent Decree,

Defendants waive any right to a different venue, including under California Water Code § 13361,

and consent to the Court's jurisdiction over this Decree or such action and over Defendants, and

consent to venue in this judicial district.

2.     Notice of the commencement of this action has been given to the state of

California, as required by Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## II. APPLICABILITY

3.     The obligations of this Consent Decree apply to and are binding on the

United States, the People of the State of California, *Ex Relatione* the CDFG, SFBRWQCB,

LRWQCB, and on the Defendants, and any successors, assigns or other entities or persons

otherwise bound by law.

4.     No transfer of ownership or operation of any Facility, whether in

compliance with the procedures of this Paragraph or otherwise, shall relieve Defendants of their

obligation to ensure that the terms of the Decree are implemented.  Defendants' transfer of

ownership or operation of any portion of the Facility within the Pacific Operations Unit to any

other person must be conditioned on the transferee's agreement to undertake the obligations

required by Section VII (Injunctive Relief) of this Consent Decree, as provided in a written

agreement between any Defendant and the proposed transferee, enforceable by the Plaintiffs as

third-party beneficiaries of such agreement.  At least thirty (30) days prior to such transfer,

Defendants shall provide a copy of this Consent Decree to the proposed transferee and shall

simultaneously provide written notice of the prospective transfer, together with a copy of the

proposed written agreement, to EPA Region 9, to the United States Department of Justice, and to the CDFG in accordance with Section XIII of this Decree (Notices).  Any transfer of ownership or operation of all or a portion of the Facility without complying with this Paragraph constitutes a violation of this Consent Decree.

5.    Defendants shall provide a copy of this Consent Decree to all officers, and employees and agents whose duties might reasonably include supervision of compliance with any provision of this Consent Decree, including supervision of any contractor retained to perform work required under this Consent Decree.  Defendants shall condition any contract to perform any work covered by this Consent Decree on performance of the work in conformity with the terms of this Consent Decree.

6.    In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III. DEFINITIONS

7.    Terms used in this Consent Decree that are defined or used in the CWA and OPA shall have the meanings assigned to them in such statute, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

A.    "Complaint" shall mean the complaint filed by Plaintiffs in this action.

B.    "Consent Decree" or "Decree" shall mean this document.

C.      "Covered Waters" shall mean all waters within the meaning of 33 U.S.C. § 1362(7) and all waters of the State within the meaning of California Water Code § 13050(e), except ground waters.

D.      "Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

E.      "Defendants" shall mean KMEP and SFPP.  For the purposes of Paragraphs 41, 44, 45 and 47 of Section XI of this Consent Decree, the Defendants' directors, officers, and employees acting within their scope of employment, in addition to Kinder Morgan Inc., Kinder Morgan Management LLC, Kinder Morgan G.P., Inc., and Kinder Morgan Operating L.P. "D", shall be considered "Defendants" and shall not be considered "third parties."

F.      "Facility" or "Facilities," as referenced in the Consent Decree, shall include all KMEP owned or SFPP operated pipelines and associated pumps, valves and pipeline operational equipment in the Pacific Operations Unit as of the date of lodging this Consent Decree, or such pipelines added to the Pacific Operations Unit during the pendency of this Consent Decree.  The "Pacific Operations Unit" currently comprises approximately 3,900 miles of hazardous liquid petroleum pipelines owned or operated by KMEP or SFPP in Arizona, California, Nevada, New Mexico, Oregon and Texas.  For purposes of this Consent Decree, the Pacific Operations Unit does not include the Carbon Dioxide or Cypress systems.

G.      "HCA" shall have the same meaning as the meaning set forth in 49 C.F.R. § 195.450.

H.      "Natural Resources" shall have the meaning set forth in OPA

§ 1001(20), 33 U.S.C. § 2701(20), and include land, fish, wildlife, biota, air, water, groundwater,

drinking water supplies, and other such resources belonging to, managed by, held in trust by,

appertaining to, or otherwise controlled by the United States or the state of California, and shall

also mean the services provided by such resources to other resources or to humans.

I.      "Natural Resource Trustees" or "Trustees" mean those federal and

state agencies or officials designated or authorized pursuant to the CWA, OPA, or state law to act

as Trustees for the Natural Resources managed by, controlled by, or appertaining to the United

States or the state of California.  Specifically, as used in this Consent Decree, these terms shall

mean the U.S. Fish and Wildlife Service and the CDFG.

J.      "Paragraph" shall mean a portion of this Consent Decree identified

by an Arabic numeral.

K.      "Parties" shall mean the United States, the People of the State of

California, *Ex Relatione* the CDFG, SFBRWQCB, LRWQCB, KMEP and SFPP.

L.      "Plaintiffs" shall mean the United States, the People of the State of

California, *Ex Relatione* the CDFG, SFBRWQCB and LRWQCB.

M.      "Section" shall mean a portion of this Consent Decree identified by

a Roman numeral.

N.      "Spill Prevention, Response or Reporting Practices" shall mean

those measures or methods adopted by Defendants as described in this Consent Decree, or as

currently required by the PHMSA Consent Agreement, or any other protocol of the Defendants

Consent Decree - 10

that is intended to prevent discharges of oil from Defendants' Facilities or intended to improve response capabilities, and ensure more accurate, timely reporting of oil discharges.

O.      "Spills" shall mean the Suisun Discharge, the Oakland Discharge and the Donner Discharge.

P.      "United States" shall mean the United States of America, acting on behalf of EPA, DOI and NOAA.

## IV. CIVIL PENALTIES

8.      Within thirty (30) days after the Effective Date of this Consent Decree, Defendants shall pay civil penalties in the amount of three million seven hundred and ninety-five thousand one hundred and thirty-five dollars ($3,795,135.00) to the Plaintiffs as follows:

A.      For alleged violations of the CWA and the California statutes set forth in Paragraph A of the foregoing recitals, Defendants shall pay a civil penalty of three million seven hundred and eighty thousand five hundred and fifty-nine dollars ($3,780,559.00), as follows:

(1)      To the United States, one million five hundred and eighty-five thousand eight hundred and ninety-three dollars ($1,585,893.00), to be paid into an escrow account bearing interest on commercially reasonable terms, in a federally-chartered bank (the "United States Escrow Account") within 15 business days after Defendants receive notice that this Consent Decree has been lodged. Such monies shall remain in escrow until entry of the Decree. If the Decree is not entered by the court, and the time for any appeal of that decision has run, or if the court's denial of entry is upheld on appeal, the monies placed in escrow, together with accrued interest thereon, shall be returned to Defendants. If the Decree is entered by the

court, Defendants shall, within 15 days thereof, cause the monies (including all accrued interest) in the United States Escrow Account to be released and disbursed to the United States.  Payment shall be made by Fedwire Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with instructions provided to Defendants, following lodging of the Consent Decree, by the Financial Litigation Unit of the Office of the United States Attorney for the Eastern District of California.  The payment shall reference the Civil Action Number assigned to this case and Department of Justice Case Number ("DOJ No." 90-5-1-1-08427, and U.S. Coast Guard reference number FPN A04010, and shall specify that the payments are made toward CWA civil penalties to be deposited into the Oil Spill Liability Trust Fund pursuant to 33 U.S.C. § 132l(s), § 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Time shall be credited on the next business day.  Defendants shall simultaneously provide to the United States notice of this payment by submitting written notice of the same and a copy of any transmittal documentation to the United States in accordance with Section XIII of this Consent Decree (Notice), and to the following:

> LT Carolyn Leonard-Cho
> National Pollution Funds Center
> 4200 Wilson Boulevard, Suite 1000
> Arlington, Virginia 22203-1804
>
> Commander Thomas Beistle
> United States Coast Guard
> Office of Claims and Litigation
> 2100 Second Street, S.W.
> Washington, D.C. 20593-0001

        (2)     To the SFBRWQCB and the LRWQCB, one million three hundred sixty thousand four hundred and forty-eight dollars ($1,360,448.00), to be paid into an escrow account bearing interest on commercially reasonable terms, in a federally-chartered bank

(the "Regional Water Board Escrow Account") within 15 business days after Defendants receive

notice that this Consent Decree has been lodged.  Such monies shall remain in escrow until entry

of the Decree.  If the Decree is not entered by the court, and the time for any appeal of that

decision has run, or if the court's denial of entry is upheld on appeal, the monies placed in

escrow, together with accrued interest thereon, shall be returned to Defendants.  If the Decree is

entered by the court, Defendants shall, within 15 days thereof, cause the monies (including all

accrued interest) in the Regional Water Board Escrow Account to be released and disbursed to

the SFBRWQCB and the LRWQCB.  Payment shall be made by cashier's or certified check

payable to the "State Water Resources Control Board-Waste Discharge Permit Fund" and sent to:

> Bruce H. Wolfe
> SFBRWQCB
> 1515 Clay Street, Suite 1400
> Oakland, CA 94612

        (3)      To the CDFG, eight hundred and thirty-four thousand two

hundred and eighteen dollars ($834,218.00), to be paid into an escrow account bearing interest on

commercially reasonable terms, in a federally-chartered bank (the "CDFG Escrow Account")

within 15 business days after Defendants receive notice that this Consent Decree has been

lodged.  Such monies shall remain in escrow until entry of the Decree.  If the Decree is not

entered by the court, and the time for any appeal of that decision has run, or if the court's denial

of entry is upheld on appeal, the monies placed in escrow, together with accrued interest thereon,

shall be returned to Defendants.  If the Decree is entered by the court, Defendants shall, within 15

days thereof, cause the monies (including all accrued interest) in the CDFG Escrow Account to

be released and disbursed to the CDFG.  Payment shall be made by cashier's check or certified

1  check payable to the California Department of Fish and Game.  The check shall reference the

2  "Kinder Morgan Spills" and reflect that it is a payment to the Fish and Wildlife Pollution

3
4  Account.  The check shall be sent by certified mail to:

5          California Department of Fish and Game
        Office of Spill Prevention and Response
6        Attn: Stephen Sawyer, Assistant Chief Counsel
        1700 "K" Street, Suite 250
7        Sacramento, CA 95814

8
9          B.      Defendants shall pay a civil penalty in the amount of fourteen

10  thousand five hundred seventy six dollars ($14,576.00), to be paid within 15 business days after

11  Defendants receive notice that this Consent Decree has been lodged into an escrow account

12
13  bearing interest on commercially reasonable terms, in a federally-chartered bank (the "ESA

14  Escrow Account").  Such monies shall remain in escrow until entry of the Decree.  If the Decree

15  is not entered by the court, and the time for any appeal of that decision has run, or if the court's

16  denial of entry is upheld on appeal, the monies placed in escrow, together with accrued interest

17
18  thereon, shall be returned to Defendants.  If the Decree is entered by the court, Defendants shall,

19  within 15 days thereof, cause the monies (including all accrued interest) in the ESA Escrow

20  Account to be released and disbursed to the United States for the claims alleged by the United

21  States for violations of the Endangered Species Act.  Said civil penalty shall be used for the

22
23  purposes authorized by 16 U.S.C. § 1540(d).  Payment shall be made by EFT to the United States

24  Department of Justice in accordance with instructions provided to Defendants, following lodging

25  of the Consent Decree, by the Financial Litigation Unit of the Office of the United States

26  Attorney for the Eastern District of California.  At the time of making such payment, Defendants

27
28  shall send a transmittal letter to the following address, indicating that the EFT has occurred and

Consent Decree - 14

1   shall include the following reference:  Kinder Morgan Energy Partners, Organization Code

2   99000, Lacey Act Reward Account: 14X1611-ECV.

3

4                      Law Enforcement
                      Attention: Scott Heard, Regional Agent in Charge
5                      U.S. Fish and Wildlife Service
                      2800 Cottage Way
6                      Sacramento, CA 95826-1846

7                      C.        Defendants shall not deduct the amounts paid under this Section in

8   calculating federal income tax.

9

10              **V. CDFG RESPONSE AND REMEDIATION MONITORING COSTS**

11              9.        Within thirty (30) days after the Effective Date of this Consent Decree,

12   Defendants shall pay twenty-two thousand four hundred and sixty-six dollars ($22,466.00) to

13   CDFG for response costs associated with the Donner Discharge.  Payment shall be made by

14   cashier's or certified check payable to the California Department of Fish and Game.  The check

15   shall reference the Kinder Morgan Donner Discharge and reflect that it is a payment to the Fish

16   and Wildlife Pollution Account.  CDFG shall deposit the money into the Oil Pollution Response

17   and Restoration Subaccount.  The check shall be sent by certified mail to the address directed in

18   Paragraph 8(A)(3), above.

19

20              10.       Within thirty (30) days after the Effective Date of this Consent Decree,

21   Defendants shall pay ninety-six thousand one hundred and fifty dollars ($96,150.00) to CDFG for

22   response costs associated with the Suisun ($39,194) and Oakland ($56,956) Discharges.

23   Payment shall be made by cashier's or certified check payable to the California Department of

24   Fish and Game.  The check shall reference the Kinder Morgan Suisun and Oakland Discharges

25

26

27

28

Consent Decree - 15

and reflect that it is a payment to the Oil Spill Response Trust Fund.  The check shall be sent by certified mail to the address directed in Paragraph 8(A)(3), above.

11.    Within thirty (30) days after the Effective Date of this Consent Decree, Defendants shall pay fifty-one thousand four hundred dollars ($51,400.00) to CDFG for remediation monitoring associated with the Donner Discharge.  Payment shall be made by cashier's or certified check payable to the California Department of Fish and Game.  The check shall reference the Kinder Morgan Donner Discharge and reflect that it is a payment to the Fish and Wildlife Pollution Account.  CDFG shall deposit the money into the Oil Pollution Response and Restoration Subaccount.  The check shall be sent by certified mail to the address directed in Paragraph 8(A)(3), above.

## VI. NATURAL RESOURCE DAMAGES PAYMENTS

12.    Within thirty (30) days after this Decree has been lodged with this Court, Defendants shall deposit the amount of one million one hundred and fifty-one thousand and ninety-nine dollars ($1,151,099.00) into an escrow account bearing interest on commercially reasonable terms, in a federally-chartered bank (hereinafter, the "Escrow Account").  If the Decree is not entered by this Court, and the time for any appeal of that decision has run, or if this Court's denial of entry is upheld on appeal, the monies placed in escrow, together with accrued interest thereon, shall be returned to Defendants.  If the Decree is entered by this Court, Defendants shall, within thirty (30) days of the Effective Date, cause the monies in the Escrow Account, and all accrued interest thereon, to be paid to DOI, on behalf of the Natural Resource Trustees, for the purposes set forth in Paragraph 13(C), below.  Such payment shall be made by EFT to the United States Department of Justice in accordance with instructions provided to

1  Defendants, following lodging of the Consent Decree, by the Financial Litigation Unit of the

2  Office of the United States Attorney for the Eastern District of California.  Defendants shall send

3
4  a transmittal letter indicating that the EFT has occurred, to the Parties in accordance with Section

5  XIII of this Decree ("Notices") and to:

6              Department of the Interior
7              Natural Resource Damage Assessment
             and Restoration Program
8              Attention: Restoration Fund Manager
             1849 "C" Street, N.W., Mail Stop 4449
9              Washington, D.C. 20240

10
11         13.    The EFT and transmittal letter shall reflect that the payment is being made

12  to the "Natural Resources Damage Assessment and Restoration Fund, Account No. 14X5198 -

13  KINDER MORGAN SUISUN OIL SPILL."  DOI will assign these funds a special project

14  number to allow the funds to be maintained as a segregated account within the Department of the

15
16  Interior Natural Resource Damage Assessment and Restoration Fund, Account No.

17  14X5198**** (the "KINDER MORGAN SUISUN OIL SPILL NRD Account").

18             A.    DOI shall, in accordance with law, manage and invest funds in the

19  KINDER MORGAN SUISUN OIL SPILL NRD Account and any return on investments or

20
21  interest accrued on the Account for use by the Natural Resources Trustees in connection with

22  Restoration of Natural Resources affected by the Spill.  DOI shall not make any charge against

23  the KINDER MORGAN SUISUN NRD Account for any investment or management services

24  provided.

25

26

27

28

B.      DOI shall hold all funds in the KINDER MORGAN SUISUN

NRD Account, including return on investments or accrued interest, subject to the provisions of

this Decree.

C.      The Natural Resources Trustees commit to the expenditure of these

funds for the design, implementation, permitting (as necessary), monitoring, and oversight of

restoration projects and for the costs of complying with the requirements of the law to conduct a

restoration planning and implementation process.  The Natural Resource Trustees plan to use the

funds for restoration, enhancement, and protection of resources injured by the Suisun Discharge

and for oversight of these restoration projects.  The allocation of funds for specific projects will

be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which

public notice, opportunity for public input, and consideration of public comment will be

provided.  The Trustees jointly retain the ultimate authority and responsibility to use the funds in

the KINDER MORGAN SUISUN NRD Account to restore Natural Resources in accordance

with applicable law, this Consent Decree, and any Memorandum of Understanding (MOU)

between them.

14.      Within thirty (30) days after the Effective Date of this Consent Decree,

Defendants shall pay twenty thousand dollars ($20,000.00) to the National Fish and Wildlife

Foundation to fund projects to restore resources damaged by the Donner Discharge.  Payment is

to be made by cashier's or certified check payable to the National Fish and Wildlife Foundation.

The check or money order shall be sent by certified mail or overnight delivery to the attention of

counsel for the CDFG at the address set forth below:

State of California Department of Fish and Game

Consent Decree - 18

Office of Spill Prevention and Response
Attn: Stephen Sawyer, Assistant Chief Counsel
1700 "K" Street, Suite 250
Sacramento, CA 95814

The check shall reference the Donner Discharge and reflect that it is a payment to the

Environmental Fund for Habitat and Incident Specific Restoration Projects. The National Fish

and Wildlife Foundation shall deposit the funds into the Riverine Subaccount of the

Environmental Fund for Habitat and Incident Specific Restoration Projects. At the time of

payment, Defendants shall simultaneously send written notice of payment and a copy of any

transmittal documentation to Plaintiffs in accordance with Section XIII of this Consent Decree

(Notices).

15.     Within thirty (30) days of the latter of the Effective Date of this Consent

Decree or delivery of an invoice, with supporting back-up documentation, to Defendants,

Defendants shall pay to DOI any reasonable unreimbursed Natural Resource Damage

Assessment costs that DOI has incurred through the Effective Date of this Consent Decree. Any

such amount payable to DOI shall be transmitted to DOI, Natural Resource Damage Assessment

and Restoration Fund, Account No. 14X5198- KINDER MORGAN SUISUN NRD Account by

EFT to the U.S. Department of Justice in accordance with instructions that the Financial

Litigation Unit of the U.S. Attorney's Office for the Eastern District of California shall provide

to Defendants following the Effective Date of this Consent Decree. At the time of payment,

Defendants shall simultaneously send written notice of payment and a copy of any transmittal

documentation (which shall reference DOJ No. 90-5-1-1-08427) to the Parties in accordance with

Section XIII of this Decree ("Notices").

Consent Decree - 19

16.     Within thirty (30) days of the date of the Effective Date of this Consent Decree, Defendants shall pay the sum of sixteen thousand, ninety-nine dollars ($16,099.00) to NOAA for reimbursement of its Natural Resource Damage Assessment costs associated with the Suisun Discharge.  Payment shall be made by EFT to the U.S. Department of Justice in accordance with instructions that the Financial Litigation Unit of the U.S. Attorney's Office for the Eastern District of California shall provide to Defendants following the Effective Date of this Consent Decree.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation (which shall reference DOJ No. 90-5-1-1-08427) to the Parties in accordance with Section XIII of this Decree ("Notices").

17.     Within thirty (30) days of the latter of the Effective Date of this Decree or the delivery of an invoice, with supporting back-up documentation, to Defendants, Defendants shall pay to CDFG reasonable unreimbursed Natural Resource Damage Assessment costs that it has incurred in connection with the Suisun discharge in the amount of one hundred and forty thousand and four hundred and eighty-four dollars ($140,484.00).  Payment is to be made by cashier's or certified check payable to the California Department of Fish and Game.  The check or money order shall be sent by certified mail or overnight delivery to:

> State of California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn: Stephen Sawyer, Assistant Chief Counsel
> 1700 "K" Street, Suite 250
> Sacramento, CA 95814

The check shall reference the "Kinder Morgan Spills" and reflect that it is a payment to the Oil Spill Response Trust Fund.

# VII. INJUNCTIVE RELIEF

18. From the Effective Date until termination of this Consent Decree, EPA and Defendants shall meet quarterly at the EPA Region IX offices in San Francisco, California, to discuss the implementation of Defendants' Spill Prevention, Response or Reporting Practices, and make modifications as agreed by the EPA and the Defendants. At such meetings, Defendants shall make available, on request, all existing information and reports relevant to evaluating Defendants' implementation of their Spill Prevention, Response or Reporting Practices, including integrity management plans or any assessment or evaluation of pipelines within the Defendants' Pacific Operating Unit. To the extent these meetings involve implementation of integrity management plan requirements under 49 C.F.R Part 195 or any actions conducted pursuant to the PHMSA Consent Agreement, Defendants shall not object to participation in such meetings by PHMSA or its representative. Defendants may request additional meetings with EPA at any time without restriction. This Paragraph does not waive or supersede any authority that EPA may have to obtain information from Defendants related to the Spills or other matters within its jurisdiction or authority. EPA may, in its sole discretion, cancel or postpone any quarterly meeting required by this Consent Decree by written notice to Defendants.

19. From the Effective Date until the termination of this Consent Decree, Defendants shall not make material changes to their Spill Prevention, Response or Reporting Practices within their Pacific Operating Unit that, as may be determined by EPA, are less protective of Covered Waters, without prior written approval from EPA. For the purpose of this

Consent Decree, "material changes" to Spill Prevention, Response or Reporting Practices shall mean:

1) the modification of any program with the effect of reducing the presence of qualified personnel at any excavation near any portion of the pipeline;

2) the modification of any obligations or schedules stated in or approved pursuant to the PHMSA Consent Agreement as of December 31, 2006;

3) the de-classification as of any portion of pipeline that, as of December 31, 2006, Defendants have designated as "could affect a" HCA, in accordance with 49 C.F.R. § 195.452.

4) the modification of pipeline assessment and repair criteria established in Section 7 (Pipeline Repair Criteria), Section 8 (Continuing Assessment and Analysis), and Appendix E (Repair Criteria) of Defendants' Integrity Management Program, where such modification might result in:  a) extending the timeframes or making less stringent the criteria for pipeline excavation, repair or replacement; b) changing repair and other remediation methods; c) reducing the  likelihood that a condition would be discovered or the timeliness of such discovery; or d) reducing the validity of ILI assessment results; or

5) the modification of the procedure to apply the same inspection, dig and repair criteria for each portion of a pipeline segment regardless of whether an identified condition is in an area that is designated as "could affect" a HCA pursuant to 49 C.F.R. § 195.452.

20.     Defendants shall provide EPA semi-annually, beginning 180 days from the Effective Date of this Consent Decree, a listing and description of any substantive changes Defendants have made regarding their Spill Prevention, Response or Reporting Practices in the

Consent Decree - 22

1    Pacific Operations Unit within the previous twelve (12) months, and upon EPA's written request,

2    provide a copy of the Defendants' written policies or practice where such changes were made.

3

4            21.     Within 90 days after notice from EPA that Defendants have made a

5    material change to their Spill Prevention, Response or Reporting Practices in the Pacific

6    Operations Unit in a manner that EPA has determined to be less protective of Covered Waters, or

7    within such other time as agreed by EPA, Defendants shall implement its former Spill

8    Prevention, Response or Reporting Practices in the Pacific Operations Unit, or shall implement

9    modifications that EPA determines are the substantive equivalent of former Spill Prevention,

10   Response or Reporting Practices in the Pacific Operations Unit.  To the extent that the

11   Defendants' Spill Prevention, Response or Reporting Practices in the Pacific Operations Unit are

12

13   required by the PHMSA Consent Agreement, any determinations by EPA will be made in

14   consultation with PHMSA.

15

16           22.     Within ninety (90) days of the Effective Date of this Consent Decree,

17   Defendants shall designate Line Sections 11, 12, and 13 of the SFPP Rocklin-Reno pipeline as

18   "could affect" an HCA, in accordance with 49 C.F.R. § 195.452, thereby subjecting those

19   portions of the pipeline to those regulations.

20

21           23.     Within ninety (90) days of the Effective Date of this Consent Decree,

22   Defendants shall request that PHMSA approve a modification to the Close Interval Survey

23   ("CIS") schedule approved pursuant to the PHMSA Consent Agreement to ensure that the CIS

24   for Line Sections 11, 12 and 13 of the SFPP Rocklin-Reno pipeline are completed by December

25   31, 2008.  Additionally, within ninety (90) days, Defendants shall request that PHMSA approve a

26   modification to the CIS schedule approved pursuant to the PHMSA Consent Agreement to

27

28

                            Consent Decree - 23

1  ensure that the CIS for Line Sections 27, 95 and 103 (located near Mococo Marsh) are completed

2  by December 31, 2010.

3                              **VIII.  STIPULATED PENALTIES**

4

5          24.     If Defendants fail to make any payments required under Section IV (Civil

6  Penalties), Section V (CDFG Response and Remediation Monitoring Costs) or Section VI

7  (Natural Resource Damages Payments) when due, Defendants shall pay a stipulated penalty of

8
9  fifteen hundred dollars ($1,500.00) to each Plaintiff not paid in full, per day for each day that the

10  payment is late.  Late payment of the obligations stated in Section IV (Civil Penalties), Section V

11  (CDFG Response and Remediation Monitoring Costs) and Section VI (Natural Resource

12  Damages Payments) shall be made in accordance with payment instructions in those Sections.

13
14  Stipulated Penalties under this Paragraph shall be paid as stated herein.  All transmittal

15  correspondence shall state that any such payment is for late payment of the settlement payments

16  due under this Consent Decree, or for stipulated penalties, as applicable.  Payments of stipulated

17
18  penalties under this Paragraph to the United States shall be made in accordance with the payment

19  instructions in Paragraph 29.  Payments to the CDFG for stipulated penalties under this

20  Paragraph shall be made in accordance with Paragraph 30.  On demand, payments to the

21  SFBRWQCB and LRWQCB for stipulated penalties under this Paragraph shall be made by

22
23  cashier's or certified check payable to the "State Water Resources Control Board - Waste

24  Discharge Permit Fund" and sent to the individual identified in Paragraph 8(A)(2), shall

25  reference the Civil Action Number assigned to this case and specify that the payment is for

26  stipulated penalties. Payments for stipulated penalties under this Paragraph based on the late

27  payment of the obligation stated in Paragraph 8(B) shall be made in accordance with Paragraph

28

8(B), shall reference the Civil Action Number assigned to this case and that the payment is for stipulated penalties.

25.     Defendants shall be liable for Stipulated Penalties to the United States for all other violations of this Consent Decree, unless excused under Section IX (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any injunctive relief, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree. Stipulated Penalties under this Paragraph shall be paid in accordance with Paragraph 29 below. Stipulated Penalties owing initially to the any agency of the state of California under this Consent Decree may be demanded by the EPA if the Stipulated Penalty arises from the untimely payment of penalties pursuant to Paragraph 8 of this Consent Decree and the respective agency of the state of California has neither demanded or received payment of the Stipulated Penalty.

| Penalty Per Violation Per Day: | Period of Noncompliance: |
| --- | --- |
| $500 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $2,000 | 31st day and beyond |

26.     Stipulated Penalties under this Section shall begin to accrue on the day after performance is due, and shall continue to accrue until performance is satisfactorily completed. Stipulated Penalties shall accrue simultaneously for separate violations of this

Consent Decree.  Defendants shall pay any Stipulated Penalty within thirty (30) days of receiving a written demand.

27.     Any Plaintiff may, in the unreviewable exercise of its respective discretion, reduce or waive Stipulated Penalties otherwise due to it under this Consent Decree.

28.     Stipulated Penalties shall continue to accrue as provided in Paragraphs 24 and 25, above, during any Dispute Resolution, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

A.     If the dispute is resolved by agreement, Defendants shall pay accrued penalties determined to be owing, together with interest, to the United States within thirty (30) days of the effective date of that agreement;

B.     If the dispute is submitted to the Court and the United States prevails in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) days of receiving the Court's decision or order, except as provided in Subparagraph C, below;

C.     If any Party appeals the District Court's decision, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) days of receiving the final appellate court decision.

29.     Defendants shall, as directed by the EPA or DOI in a demand, pay stipulated penalties due and owing by EFT in accordance with instructions to be provided by the Financial Litigation Unit of the U.S. Attorney's Office for the Eastern District of California, or

by certified or cashier's check in the amount due, payable to the "U.S. Department of Justice," referencing DOJ No. 90-5-1-1-08427, and delivered to:

> United States Attorney, Financial Litigation Unit
> Eastern District of California
> 501 I Street, Suite 10-100
> Sacramento, California 95814

Payment of stipulated penalties shall be accompanied by transmittal correspondence that specifies that the payment is for stipulated penalties due under this Decree and shall reference DOJ No. 90-5-1-1-08427 and the case name and number, and by notice to the United States as provided in Section XIII (Notices).

30.     Defendants shall, as directed by CDFG in its demand, pay stipulated penalties owing to CDFG by certified or cashier's check in the amount due, payable to the California Department of Fish and Game.  The check shall reference the "Kinder Morgan Spills" and reflect that it is a payment to the Fish and Wildlife Pollution Account.  Payment of stipulated penalties shall be accompanied by transmittal correspondence stating that any such payment is for stipulated penalties due under this Consent Decree and shall reference the case name and number.  The check shall be sent by certified mail to:

> State of California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn: Stephen Sawyer, Assistant Chief Counsel
> 1700 "K" Street, Suite 250
> Sacramento, CA 95814

31.     Defendants shall not deduct Stipulated Penalties paid under this Section in calculating federal income tax.

Consent Decree - 27

32.     If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.

33.     Subject to the provisions of Section XI of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to Plaintiffs for Defendants' violation of this Consent Decree or applicable law.

## IX.  FORCE MAJEURE

34.     A "force majeure event" is any event beyond the control of Defendants, their contractors, or any entity controlled by any Defendant that delays the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. "Best efforts" includes anticipating any potential force majeure event and addressing the effects of any such event (a) as it is occurring and (b) after it has occurred, to prevent or minimize any resulting delay to the greatest extent possible. "Force Majeure" does not include any Defendant's financial inability to perform any obligation under this Consent Decree.

35.     Defendants shall provide notice verbally or by electronic or facsimile transmission to EPA and CDFG as soon as possible, but not later than 72 hours after the time any Defendant first knew of, or by the exercise of due diligence, should have known of, a claimed force majeure event. Defendants shall also provide written notice, as provided in Section XIII of this Consent Decree (Notices), within seven days of the time any Defendant first knew of, or by the exercise of due diligence, should have known of, the event.  The notice shall state the anticipated duration of any delay; its cause(s); Defendants' past and proposed actions to

prevent or minimize any delay; a schedule for carrying out those actions; and Defendants' rationale for attributing any delay to a force majeure event. Failure to provide verbal and written notice as required by this Paragraph shall preclude Defendants from asserting any claim of force majeure.

36.     If the United States agrees that a force majeure event has occurred, the United States may agree to extend the time for Defendants to perform the affected requirements for the time necessary to complete those obligations. An extension of time to perform the obligations affected by a force majeure event shall not, by itself, extend the time to perform any other obligation. Where the United States agrees to an extension of time, the appropriate modification shall be made pursuant to Section XVI of this Consent Decree (Modification) and is not a material change under that Section.

37.     If the United States does not agree that a force majeure event has occurred, or does not agree to the extension of time sought by Defendants, the United States' position shall be binding, unless Defendants invoke Dispute Resolution under Section X of this Consent Decree. In any such dispute, Defendants bear the burden of proving, by a preponderance of the evidence, that each claimed force majeure event is a force majeure event, that Defendants gave the notice required by Paragraph 35, that the force majeure event caused any delay Defendants claim was attributable to that event, and that Defendants exercised best efforts to prevent or minimize any delay caused by the event.

## X. DISPUTE RESOLUTION

38.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve

disputes arising under or with respect to this Consent Decree.  However, such procedures shall not apply to actions by Plaintiffs to enforce obligations of Defendants under this Consent Decree that have not been disputed in accordance with this Section.

39.     Any dispute subject to dispute resolution under this Consent Decree shall first be the subject of informal negotiations between the United States and Defendants.  The dispute shall be considered to have arisen when Defendants send a written notice of dispute, as provided in Section XIII of this Decree (Notices).  Such notice of dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed twenty-one (21) days from the date the dispute arises, unless that period is modified by written agreement.  If informal negotiations are unsuccessful, then Plaintiffs' position shall control unless Defendants file with the court a petition to resolve the dispute within thirty (30) days after the conclusion of the informal negotiation period.  In any dispute under this Paragraph, Defendants shall bear the burden of demonstrating that their position clearly complies with this Consent Decree and the CWA, OPA, and any other applicable law, and that Defendants are entitled to relief under applicable law.

40.     The invocation of dispute resolution procedures under this Section shall not extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, not directly in dispute.  Stipulated Penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 39, above.  If Defendants do not prevail on the disputed issue, Stipulated Penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## XI. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

41.     Effective on KMEP's and SFPPs' performance of their payment obligations set forth in Sections IV, V and VI, this Consent Decree resolves the Defendants' liability for the civil claims of the United States, the People of the State of California, *Ex Relatione* the CDFG, SFBRWQCB, and the LRWQCB for the violations alleged in the Complaint filed in this action.  Plaintiffs reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall not be construed to prevent or limit the rights of the United States, the People of the State of California, *Ex Relatione* the CDFG, SFBRWQCB and the LRWQCB, to obtain penalties or injunctive relief under the CWA or under other state or federal laws, regulations or permit conditions, except as expressly specified herein.

42.     In any subsequent administrative or judicial proceeding as reserved in Paragraph 47 herein initiated by the United States, or the People of the State of California, *Ex Relatione* the CDFG, SFBRWQCB, and the LRWQCB relating to the Spills, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based on any contention that the claims raised by the United States, or the People of the State of California, *Ex Relatione* the CDFG, SFBRWQCB, and the LRWQCB in the subsequent proceeding were or should have been brought in the instant case.

43.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws,

Consent Decree - 31

regulations, orders, contracts and permits. Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to said laws, regulations, orders, contracts or permits. Plaintiffs do not, by their consent to the entry of this Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, or with any other provisions of federal, state, or local laws, regulations, orders, contracts or permits.

44. This Consent Decree does not limit or affect the rights of Defendants or of the United States, the People of the State of California, *Ex Relatione* the CDFG, SFBRWQCB, or the LRWQCB against any third parties that are not party to this Consent Decree, nor does it limit the rights of third parties that are not party to this Consent Decree against Defendants, except as otherwise provided by law.

45. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third parties that are not party to this Consent Decree.

46. Defendants hereby covenant not to sue and agree not to assert any claims related to the Spills, or response activities in connection with the Spills, against the United States, the CDFG, SFBRWQCB, and the LRWQCB pursuant to the CWA, OPA, or any other federal law, state law, or regulation including, but not limited to, any direct or indirect claim for reimbursement from the Oil Spill Liability Trust Fund, or pursuant to any other provision of law.

47. This Consent Decree is without prejudice to the rights, if any, of the United States, the CDFG, SFBRWQCB, and the LRWQCB against Defendants with respect to all matters other than those expressly set forth in Paragraph 41 of this Consent Decree, including, but not limited to, the following:

1        A.     claims based on a failure of Defendants to meet a requirement of

2 this Consent Decree;

3

4        B.     any and all criminal liability;

5        C.     past, present, or future releases, discharges, or discharges of oil

6 other than the Spills described in the Complaint;

7        D.     reimbursement for any disbursements from the Federal Oil Spill

8

9 Liability Trust Fund arising from the Spills or any other related incident, pursuant to OPA,

10 including for subrogated claims under Section 1015 of OPA, 33 U.S.C. § 2715;

11        E.     any reasonable and previously unreimbursed removal and

12

13 monitoring costs (except monitoring costs for Donner) incurred by the CDFG after the Effective

14 Date of this Consent Decree, in connection with the Spills;

15        F.     any potential future claims for cleanup, remediation, and Natural

16 Resource damages based on oil in the environment from the Oakland Discharge that is causing or

17

18 threatens to cause the release into waters of the United States a quantity oil that may be harmful

19 as that phrase is defined at 40 C.F.R. § 110.3, or causing injuries to Natural Resources unknown

20 to Plaintiffs as of the Effective Date of this Consent Decree;

21        G.     any potential future claims for cleanup, remediation, and Natural

22

23 Resource damages based on oil in the environment from the Donner Discharge remaining in the

24 event of the failure of the natural attenuation remedy, as provided in the Soil, Sediment, and

25 Water Monitoring Plan for the Kinder Morgan Donner Pass Petroleum Release, dated February

26 8, 2006, prepared by CDFG.

27

28

Consent Decree - 33

1      H.      any proceedings against Defendants in this action or in a new

2   action seeking recovery of damages to Natural Resources resulting from the Spills based on:  (1)

3   conditions with respect to the Spills unknown to the United States or the State as of the date of

4   lodging of this Consent Decree that contribute to the injury to, destruction of, or loss of natural

5   resources; or (2) new information received by the United States or the State after the date of

6   lodging of this Consent Decree that indicates there is injury to, destruction of, or loss of

7   resources of a type or magnitude unknown to the United States as of the date of execution of this

8   Consent Decree.

### XII.  COSTS

48.      The Parties shall bear their own costs in this action, including attorneys'

fees, except that the Plaintiffs shall be entitled to collect costs, including reasonable attorneys'

fees, incurred in any action necessary to collect any portion of the civil penalty or any stipulated

penalties due but not paid by Defendants.

### XIII.  NOTICES

49.      Unless otherwise specified herein, whenever notifications, submissions, or

communications are required by this Consent Decree, they shall be made in writing and

addressed as follows:

As to the United States:

As to the U.S. Department of Justice:
                          Angela O'Connell (re: DOJ No.  90-5-1-1-08427)
                          Environmental Enforcement Section
                          Environment and Natural Resources Division
                          U.S. Department of Justice
                          301 Howard Street, Suite 1050
                          San Francisco, CA 94105

Consent Decree - 34

As to EPA:

J. Andrew Helmlinger
Attorney Advisor
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street (ORC-3)
San Francisco, CA 94104

To receive verbal notification as required by this Decree: 415/972-3904

As to the DOI:

Charles McKinley
Assistant Field Solicitor
1111 Jackson Street
Suite 735
Oakland, CA 94607

As to NOAA:

Katherine Pease
Senior Counselor for Natural Resources
Office of General Counsel
501 W. Ocean Boulevard, Suite 4470
Long Beach, CA 90802-4213

As to CDFG:

Katherine Verrue-Slater
Staff Counsel III
Stephen Sawyer
Assistant Chief Counsel
Department of Fish and Game
Office of Spill Prevention and Response
1700 "K" Street, Suite 250
Sacramento, CA 95814

As to the SFBRWQCB:

Yuri Won
Staff Counsel III
State Water Resources Control Board
c/o San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

Consent Decree - 35

As to the LRWQCB:

        David Coupe
        Staff Counsel
        State Water Resources Control Board
        1001 I Street, 22nd Floor
        Sacramento, CA 95814

As to Defendants:

        Ronald McClain
        Vice President, Products Pipelines
        Kinder Morgan Energy Partners
        One Allen Center, Suite 1000
        500 Dallas
        Houston, TX  77002

        David R. DeVeau
        Vice President, Deputy General Counsel
        Kinder Morgan Energy Partners
        One Allen Center, Suite 1000
        500 Dallas
        Houston, TX  77002

        Barry R. Ogilby
        Cooper, White & Cooper LLP
        1333 N. California Blvd., Suite 450
        Walnut Creek, CA  94596

      50.    Any Party may, by written notice to the other Parties, change its designated

notice recipient or notice address provided above.

      51.    Notices submitted pursuant to this Section shall be deemed submitted

upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the

Parties in writing.

## XIV.  EFFECTIVE DATE

      52.    The Effective Date of this Consent Decree shall be the date on which this

Consent Decree is entered by the Court.

Consent Decree - 36

## XV. RETENTION OF JURISDICTION

53.     The Court shall retain jurisdiction over this case until termination of this

Consent Decree, for the purpose of resolving disputes arising under this Decree or entering

orders modifying this Decree, pursuant to Sections X (Dispute Resolution) and XVI

(Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XVI. MODIFICATION

54.     The terms of this Consent Decree may be modified only by a subsequent

written agreement signed by all the Parties.  Where the modification constitutes a material

change to any term of this Decree, it shall be effective only on approval by the Court.

## XVII. TERMINATION

55.     After Defendants have completed performance of their obligations

required by this Decree, including payments under Sections IV, V and VI of this Decree, any

accrued Stipulated Penalties under Section VIII, and Injunctive Relief under Section VII, and no

sooner than five (5) years after the Effective Date of this Consent Decree, Defendants may

submit to Plaintiffs in writing a request for termination, stating that Defendants have satisfied

those requirements, together with all necessary supporting documentation.

56.     If the Plaintiffs agree that the Defendants have satisfied the requirements

of this Consent Decree, the United States shall file a motion or a joint stipulation for termination

of the Decree.  Plaintiffs may agree to terminate the Decree without any request from

Defendants.

57.     If the Plaintiffs do not agree with Defendants that Defendants have

satisfied the requirements of this Consent Decree, the Defendants may invoke Dispute Resolution

Consent Decree - 37

under Section X of this Decree.  However, Defendants may not seek Dispute Resolution of any dispute pursuant to this Section until ninety (90) days after service of its Request for Termination.

### XVIII.  PUBLIC PARTICIPATION

58.    This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) days for public notice and comment, consistent with the procedures set forth in 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Defendants agree not to oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendants in writing that it no longer supports entry of the Decree. Defendants consent to entry of this Consent Decree without prior notice.

### XIX.  SIGNATORIES/SERVICE

59.    The Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, on behalf of the United States, and each undersigned representative of the People of the State of California, *Ex Relatione* the CDFG, SFBRWQCB, LRWQCB and Defendants certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Decree.

60.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

61.   Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XX.  INTEGRATION

62.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether verbal or written.

## XXI.  FINAL JUDGMENT

63.   On approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the Plaintiffs and Defendants.

64.   The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment.


This Consent Decree is dated and entered this _____ day of _____, 2007.


_____

UNITED STATES DISTRICT JUDGE

Eastern District of California

Consent Decree - 39

1  Signature Page to Consent Decree

2  FOR PLAINTIFF UNITED STATES OF AMERICA:

3

4  Date: 5/10/07

5
                              MATTHEW J. McKEOWN
6                             Acting Assistant Attorney General
7                             Environment and Natural Resources Division
                              United States Department of Justice
8                             P.O. Box 7611
                              Washington, D.C. 20044-7611
9

10 Date: 5/9/07

11
                              ANGELA O'CONNELL
12                            Trial Attorney
13                            Environmental Enforcement Section
                              Environment & Natural Resources Division
14                            U.S. Department of Justice
15                            301 Howard Street, Ste. 1050
                              San Francisco, CA 94105
16                            Tel: 415/744-6485
                              Fax: 415/744-6476
17

18

19

20

21

22

23

24

25

26

27

28

                              Consent Decree - 40

1    Signature Page to Consent Decree
FOR PLAINTIFF UNITED STATES OF AMERICA (continued):

2

3    Date: _May 14, 2007_

4                      McGREGOR W. SCOTT

5                      United States Attorney

6

7

8        By _____

                     E. ROBERT WRIGHT

9                      Assistant United States Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                    Consent Decree - 41

1  Signature Page to Consent Decree
2  FOR THE ENVIRONMENTAL PROTECTION AGENCY:

3

4  Date: _24 APRIL 2007_

5  WAYNE NASTRI
   Regional Administrator
6  U.S. Environmental Protection Agency, Region IX
7  San Francisco, CA

8

9  Of Counsel:
10 Date: _Apr.l 10 2o7_

11 J. ANDREW HELMLINGER
   Attorney Advisor
12 U.S. Environmental Protection Agency, Region IX
13 75 Hawthorne Street, ORC-3
   San Francisco, CA 94104
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Consent Decree - 42

1  Signature Page to Consent Decree
2  FOR THE UNITED STATES DEPARTMENT OF THE INTERIOR:

3
   Date: 5-7-07
4
                        _Daniel G. Shillito_
5                       DANIEL G. SHILLITO
6                       Regional Solicitor
                        2800 Cottage Way
7                       Sacramento, California 95825

8  Of Counsel:

9  Date: 4/16/07
10
                        _Charles McKinley_
11                      Charles McKinley
                        Office of the Field Solicitor
12                      1111 Jackson Street, Suite 735
                        Oakland, California 94607
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                        Consent Decree - 43

Signature Page to Consent Decree.
FOR THE ENVIRONMENTAL PROTECTION AGENCY(continued):

Date: **5/7/2007**

GRANTA Y. NAKAYAMA
Assistant Administrator for Office of
Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Washington, D.C.

Of Counsel:

Date: **4/9/07**

CHERYL T. ROSE
Senior Attorney
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Mail Code 2243A
1200 Pennsylvania Ave., NW
Washington, D.C. 20460

Consent Decree - 44

1  Signature Page to Consent Decree
2  FOR PLAINTIFF THE CALIFORNIA DEPARTMENT OF FISH AND GAME:

3
4  Date: ___4 /16/07_____      _____

5                                LISA CURTIS, Administrator
                                 California Department of Fish and Game
6                                Office of Spill Prevention and Response
7                                1700 K Street, Suite 250
                                 Sacramento, CA 95814
8
9  Of Counsel:
10
11 Date: _4/5/07_____          _____
12                              STEPHEN L. SAWYER
13                              Assistant Chief Counsel
                                Department of Fish and Game
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                              Consent Decree - 45

Signature Page to Consent Decree
FOR PLAINTIFF THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD,
SAN FRANCISCO BAY REGION:

Date: April 13, 2007

BRUCE H. WOLFE
Executive Officer
California Regional Water Quality Control Board,
San Francisco Bay Region
1515 Clay Street, Suite 1400
Oakland, CA 94612

Of Counsel:

Date: 13 April 07

ANITA E. RUUD
Deputy Attorney General
California Office of the Attorney General

Consent Decree - 46

Signature Page to Consent Decree
FOR PLAINTIFF THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD,
LAHONTAN REGION:

Date: April 10, 2007

HAROLD J. SINGER
Executive Officer
California Regional Water Quality Control Board
  Lahontan Region
2501 Lake Tahoe Blvd.
South Lake Tahoe, CA 96150

Of Counsel:

Date: 13 April 07

ANITA E. RUUD
Deputy Attorney General
California Office of the Attorney General

Consent Decree - 47

1    Signature Page to Consent Decree
2    FOR DEFENDANT KINDER MORGAN ENERGY PARTNERS, L.P.,

3                       By: Kinder Morgan G.P., Inc.
4                           its General Partner

5                       By: Kinder Morgan Management LLC,
6                           the Delegate of Kinder Morgan G.P., Inc.

7    Dated: _4/11/2007_        By: _Thomas A. Bannigan_
8                           Name:  THOMAS A. BANNIGAN
9                           Title:  Vice President

10    FOR DEFENDANT SFPP, L.P.,

11                      By: Kinder Morgan Operating
                             L.P. "D", its General Partner
12

13                      By: Kinder Morgan G.P., Inc.
                             its General Partner
14

15                      By: Kinder Morgan Management LLC,
16                           the Delegate of Kinder Morgan G.P., Inc.

17    Dated: _4/11/2007_        By: _Thomas A. Bannigan_
18                           Name:  THOMAS A. BANNIGAN
                           Title:  Vice President

19

20

21

22

23

24

25

26

27

28

Consent Decree - 48

# ATTACHMENT A



April 3, 2006

Mr. Joseph Ahern
Acting Chief Counsel
Pipeline and Hazardous Materials Safety Administration
U.S. Department of Transportation
400 Seventh Street, S.W.
Suite 8417
Washington, DC  20590

Re:  Kinder Morgan Energy Partners, L.P., CPF No. 5-2005-5025H

Dear Joe:

Attached is an executed original of the Consent Agreement in the above referenced case.
Execution date is April 4, 2006.

Sincerely,

Thomas A. Bannigan
President
Kinder Morgan Products Pipelines

Attachment

cc:   Robert E. Hogfoss, Esq.
      Catherine Little, Esq.
      Ron McClain, Kinder Morgan

MAR-29-06  10:16        202 366 7041                    P.03        R-139    Job-927
    3-29-06:11:09AM:                                              :202 366 7041      #  3/ 30

DEPARTMENT OF TRANSPORTATION
PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
OFFICE OF PIPELINE SAFETY
WASHINGTON, DC 20590

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Kinder Morgan Energy Partners, L.P., ) | CPF No. 5-2005-5025H |
| ) | |
| Respondent ) | |

## CONSENT AGREEMENT

On August 24, 2005, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Department of Transportation, issued Corrective Action Order (CAO) No. 5-2005-5025H to Kinder Morgan Energy Partners, L.P. (Respondent). Having agreed that settlement of the CAO is in the public interest and that entry of this Consent Agreement is the most appropriate means of resolving the CAO, without adjudication of any issue of fact or law, and upon consent and agreement of Respondent and PHMSA ("the Parties"), the following is agreed upon:

### I. General Provisions

1. PHMSA issued CAO No. 5-2005-5025H to Respondent pursuant to 49 U.S.C. § 60112 and 49 C.F.R. § 190.233. The CAO directed Respondent to take certain corrective action with regard to its 3,900-mile Pacific Operations unit of hazardous liquid pipeline systems located in Arizona, California, Nevada, New Mexico, Oregon, and western Texas. The Pacific Operations unit includes, among Respondent's hazardous liquid systems in the above-mentioned states, the CALNEV and Sante Fe Pacific Pipelines systems and associated bulk terminals; it does not include the Carbon Dioxide system or the Cypress system. The CAO was predicated on PHMSA's determination that continued operation of the Pacific Operations unit absent specified corrective actions would be hazardous. Respondent filed a Request for Hearing on September 6, 2005, which disputed the factual and legal bases of the CAO, after which Respondent and PHMSA engaged in informal settlement discussions resulting in this Consent Agreement.

2. Respondent's participation in this Consent Agreement shall not constitute or be construed as an admission of liability. By entering into this Consent Agreement,

Respondent does not admit to any fact, allegation, or conclusion contained in CAO No. 5-2005-5025H.

3. Respondent hereby waives any right to administrative or judicial hearing or appeal on any issue of law or fact set forth in CAO No. 5-2005-5025H.

4. This Consent Agreement shall apply to and be binding upon PHMSA and Respondent, its officers, directors, and employees. This Consent Agreement applies to the entirety of all hazardous liquid pipeline systems within Respondent's Pacific Operations unit as defined in Paragraph 1 herein existing at the time of execution of this Consent Agreement and is not limited to segments of the pipeline that could affect a high consequence area (HCA), as defined by 49 C.F.R. § 195.450. These pipeline systems described in Paragraph 1 will remain subject to this Consent Agreement in the event that Respondent changes the name or organizational structure of the Pacific Operations unit or the pipeline systems within the unit.

5. Nothing in this Consent Agreement limits or modifies any of PHMSA's authorities under the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, regulations promulgated thereunder, or any other applicable law, including PHMSA's authorities to bring enforcement actions against Respondent pursuant to any applicable laws or regulations. This Consent Agreement does not waive or modify any requirements that are applicable to Respondent's pipeline systems under the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, regulations promulgated thereunder, or any other provision of Federal or state law.

6. Pursuant to 49 U.S.C. § 60112(c), PHMSA has provided appropriate state officials notice and opportunity to comment on the agreement to resolve this matter.

7. Respondent agrees to fully and completely perform all of the terms of this Consent Agreement. In exchange for this agreement by Respondent, PHMSA agrees to withdraw the CAO and hazardous facility determination set forth therein. These agreements and such withdrawal shall be effective on the Effective Date of this Consent Agreement.

8. Upon the Effective Date of this Consent Agreement, Respondent's Request for Hearing shall be withdrawn.

9. This Consent Agreement constitutes the final, complete and exclusive agreement between the Parties with respect to the settlement embodied in this Consent Agreement, and the Parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Consent Agreement.

- 2 -

## II. Work to Be Performed

10. Respondent will conduct a comprehensive analysis of all accidents that have occurred since March 31, 2001 on the Pacific Operations unit that were required to be reported under 49 C.F.R. §§ 195.50 or 195.52 and all documented occurrences with regard to the Pacific Operations unit that field or control room staff responded to because of potential safety impacts to persons or property ("near misses"). The "near misses" will be identified through operation notes available from 2003 forward, product movement logs since 2001, and inline inspection dig logs since March 2001. The analysis of these accidents and documented occurrences will identify all potential and existing threats to the integrity of the Pacific Operations unit. Potential and existing threats include, but are not limited to: ongoing maintenance issues, environmental changes, original construction practices, outside force damage, line marking, one-call procedures, internal and external corrosion susceptibility (prevention and mitigation), human errors, personnel training, and Supervisory Control and Data Acquisition (SCADA) capabilities.

> A. Respondent will execute a remediation plan to address the threats identified by the comprehensive analysis. The remediation plan will contain all planned pipeline repairs or changes to operations and maintenance, personnel qualification or training, or corrosion control procedures or activities required to address all threats identified by the analysis and will contain a schedule for these repairs or changes. In addition, the remediation plan will provide for implementation of Respondent's East Coast Products Pipeline Near Miss Tracking System throughout the Pacific Operations unit.

> B. Respondent will repair all conditions defined under 49 C.F.R. § 195.452(h)(4)(i) through (iv) that are revealed by the comprehensive analysis or any activity related to the analysis within the timeframes set out in 49 C.F.R. § 195.452(h)(4) and in compliance with 49 C.F.R. § 195.422.

> C. Respondent will incorporate into its Integrity Management Program, required by 49 C.F.R. § 195.452, any information resulting from the comprehensive analysis relevant to a pipeline or facility that could affect an HCA. Based on the comprehensive analysis, Respondent will modify as necessary its Integrity Management Program elements including, but not limited to, improvements to its baseline assessment plan, information analysis, criteria for remedial actions to address integrity issues, assessment and evaluation methods, preventive and mitigative measures to protect HCAs, and employee qualifications to review integrity assessment results and information analyses.

> D. Respondent will provide a list of all accidents and documented occurrences subject to the comprehensive analysis to the Director, Western Region, Office of Pipeline Safety (OPS) for review and approval within 45 days of the Effective Date of this Consent Agreement. Respondent will submit the comprehensive

- 3 -

analysis and remediation plan for review and approval to the Director within 6 months of the Effective Date. Respondent will submit proposed changes to its Integrity Management Program to the Director for review and approval within 4 months of the Effective Date. Respondent will implement the remediation plan on the schedule approved by the Director and will make all changes to its Integrity Management Program within 30 days of receiving approval from the Director.

E. When submitting for review the comprehensive analysis, the remediation plan, and proposed changes to its Integrity Management Program, Respondent will include separate certifications as to the veracity of the factual information contained in each submission signed by a director or officer for Respondent.

F. Respondent will retain (see Paragraph 18) an independent risk assessment expert(s) to review the comprehensive analysis and remediation plan prior to submitting these items to the Director, Western Region, OPS. The independent expert will review the development of the analysis and remediation plan, verifying that Respondent has included all known accidents and occurrences, has properly identified potential and existing threats, and will adequately address the identified threats through the remediation plan. Respondent will also retain an independent risk assessment expert(s) to review its Integrity Management Program in order to verify that Respondent has adequately identified Integrity Management Program elements requiring improvement. The expert will review all proposed changes to the Integrity Management Program before Respondent submits them to the Director, verifying that the proposed changes will adequately address the potential and existing threats identified in areas of the Pacific Operations unit that could affect a high consequence area.

11. Respondent will create a system to integrate all data relevant to the integrity of the Pacific Operations unit for use in its operations and maintenance procedures and Integrity Management Program. The system will be based on Respondent's existing natural gas GIS PODS system and will graphically incorporate, at a minimum, internal inspection tool data, close interval and cathodic protection survey data, coating survey data, excavation and inspection data, foreign line crossing data, pipeline materials specifications, and HCA data. The system will be capable of graphically displaying all integrated data by location and will link the aforementioned data to the uniform right-of-way stationing system developed pursuant to Paragraph 14H of this Section. Respondent will submit a proposal detailing the design of the system and a proposed schedule for populating the system with relevant data no later than 2 months after the Effective Date of this Consent Agreement for the approval of the Director, Western Region, OPS.

12. Respondent will perform an outside force damage assessment by internally inspecting all Pacific Operations unit pipelines within 5 years of the Effective Date of this Consent Agreement.

- 4 -

A. Within 6 months of the Effective Date, Respondent will submit to the Director, Western Region, OPS for review and approval a description of all tools that will be used to internally inspect any segment of the Pacific Operations unit along with an explanation as to why the tool is the most technically appropriate selection to assess outside force damage for that segment. All internal inspection tools proposed by Respondent for the Director's approval will be capable of assessing axial gouges that are not associated with dents. Upon the approval of the Director, Respondent will carry out that assessment within the 5-year timeframe.

B. In the event that Respondent determines a segment of the Pacific Operations unit is incapable of receiving any internal inspection tool, Respondent will submit a proposal to the Director within 6 months of the Effective Date for the assessment of that segment within the 5-year timeframe using hydrostatic testing or a technology better suited to assess outside force damage, subject to the Director's approval. Upon the approval of the Director, Respondent will carry out that assessment within the 5-year timeframe.

C. If a more effective technology for assessing outside force damage becomes available after the Director has approved Respondent's proposed internal inspection tool(s), Respondent may seek the Director's approval to use the newly-available technology.

D. Respondent will repair all gouges and other conditions defined under 49 C.F.R. § 195.452(h)(4)(i) through (iv) that are revealed by the assessment on a schedule that comports with the deadlines set out in 49 C.F.R. § 195.452(h)(4) and in compliance with 49 C.F.R. § 195.422.

E. The requirements of the preceding subparagraphs (A through D) shall apply to all hazardous liquid pipeline systems covered by this Consent Agreement unless Respondent demonstrates to the satisfaction of the Director, Western Region, OPS through a risk assessment verified by an independent risk assessment expert, that any particular pipeline segment has not been subject to outside force damage in the form of undetected third party damage, mechanical pipe damage inflicted during construction of the pipeline, or other mechanical damage inflicted by outside forces. In such case, after approval of the Director, the Respondent may exclude such segment from the internal inspection otherwise required by the preceding subparagraph. In no event shall the performance of such a risk assessment alter the deadlines established under the preceding subparagraphs.

13. Respondent will assess the adequacy of its corrosion control systems, performing close interval surveys of all of the Pacific Operations unit hazardous liquid pipeline systems within 10 years of the Effective Date of this Consent Agreement.

- 5 -

A. Respondent will propose a schedule to be approved by the Director, Western Region, OPS for the close interval surveys that ensures that the 50% of the Pacific Operations unit pipeline mileage considered most susceptible to corrosion will be evaluated within 5 years of the Effective Date. As part of the schedule, Respondent may propose to include close interval surveys performed on the Pacific Operations unit on or after January 1, 2003. Respondent will determine the susceptibility of all Pacific Operations unit pipeline segments to corrosion based on all available relevant data, including data pertaining to coating conditions, cathodic protection readings, and inline inspections. These determinations will be provided to the Director with the proposed schedule for completing close interval surveys.

B. Respondent will perform the close interval surveys in accordance with National Association of Corrosion Engineers (NACE) standard RP0169-96. With respect to each location where the cathodic protection fails to conform to the standard set forth in NACE RP0169-96, hereinafter the "Performance Standard," Respondent will bring the cathodic protection at each location into compliance with the Performance Standard within 1 year of the date of the close interval survey, except for interference currents, which will be eliminated within 60 days. Respondent will verify that these measures comply with the Performance Standard through pipe-to-soil readings measured in accordance with NACE standard RP0169-96.

C. Respondent will submit written corrosion control status reports to the Director, Western Region, OPS at least once every 6 months beginning on the first of the month 3 months after the Effective Date of this Consent Agreement. The first written corrosion control status report will include the proposed schedule for the close interval surveys required under this Paragraph. The status reports submitted to the Director thereafter will include a description of all corrosion control-related work performed pursuant to this Consent Agreement, an identification of each location on the pipeline (using, at a minimum, the stationing system developed pursuant to Paragraph 14H of this Consent Agreement) that the close interval survey has identified as falling below the Performance Standard, a description of the corrective measures to be taken to bring that location up to the Performance Standard, and, once those measures have been completed at that location on the schedule required herein, a certification that Respondent has performed pipe-to-soil readings measured in accordance with NACE standard RP0169-96, and that the cathodic protection system at such location meets the Performance Standard.

D. In conjunction with the close interval surveys, and within 3 months after the close interval survey has been performed at a particular location, Respondent will integrate the data obtained from the close interval surveys with data regarding corrosion obtained from internal surveys (along with all other relevant data) to identify areas on the pipeline where the coating may be disbonded or damaged. For those areas where the integrated data indicates that the coating may be

disbonded or damaged, Respondent will, within 6 months thereafter, verify whether the coating is disbonded or damaged at that location and make appropriate repairs to achieve compliance with the Performance Standard. Respondent will verify that these measures have in fact achieved compliance with the Performance Standard through pipe-to-soil readings measured in accordance with NACE standard RP0169-96.

E. Respondent will provide for approval by the Director, Western Region, OPS, a schedule of no greater than 10 years for follow-up close interval surveys for each line segment of the Pacific Operations. The Director will consider a reassessment schedule that is greater than 10 years, if sufficient technical justification is provided in writing by Respondent.

14. Respondent will develop a program to enhance the value of internal inspections for identifying integrity threats. In addition to the work to be performed as described in the subparagraphs below, the program will integrate all data obtained through the work performed within its operations and maintenance procedures and Integrity Management Program, where applicable. Respondent will ensure that all internal inspections conducted after the Effective Date of this Consent Agreement comport at a minimum with the requirements of all subparagraphs below and the requirements of 49 C.F.R. § 195.452(c)(1)(i)(A) unless the Director, Western Region, OPS provides written permission allowing an assessment to be performed via hydrostatic testing or other technology that will be more effective for assessing the integrity of the pipeline.

A. Respondent will develop algorithms for assessing data obtained from metal loss tools utilizing interaction lengths that consider both general corrosion and localized pitting. Assessment of metal loss anomalies will consider tool tolerances and corrosion growth based on recognized industry practices or Respondent's operating knowledge. Respondent will submit the algorithms for approval to the Director, Western Region, OPS within 3 months from the Effective Date of this Consent Agreement. Upon approval, Respondent will use the algorithms in assessing data obtained from all metal loss tools, including magnetic flux leakage and ultrasonic devices.

B. Respondent will evaluate all internal inspection tool data regarding general corrosion in accordance with NACE standard RP-102-2002 Section 8.4.3.2.3. Respondent may revise the interaction length detailed in the NACE standard if it presents field data to the Director, Western Region, OPS demonstrating that a shorter interaction length would be equally effective to identify integrity-threatening corrosion, and if the Director approves this revision.

C. Respondent will develop a methodology to identify the growth of corrosion in a single joint of pipe where individual corrosion anomalies may not require excavation and remediation under 49 C.F.R. Part 195, but that, based on the rate

of corrosion growth, pose a risk to the joint of pipe. Respondent will submit the methodology to the Director, Western Region, OPS within 3 months from the Effective Date of this Consent Agreement for approval. Upon approval, Respondent will apply the methodology with respect to all internal inspection data obtained regarding corrosion. With respect to each location on the pipeline determined through application of the methodology to be at risk from corrosion, Respondent will promptly make repairs and take all other measures necessary to ensure the integrity of the pipeline. Respondent will repair all conditions defined under 49 C.F.R. § 195.452(h)(4)(i) through (iv) on a schedule that comports with the deadlines set out in 49 C.F.R. § 195.452(h)(4) and in compliance with 49 C.F.R. § 195.422.

D. Respondent will reevaluate magnetic flux leakage internal inspections conducted on all hazardous liquid pipelines in the Pacific Operations unit since 1997 in accordance with the above subparagraphs A, B, and C within 6 months from the Effective Date of this Consent Agreement. Respondent will re-determine the safe operating pressure for the Pacific Operations pipeline systems based on the results of the reevaluation and will not exceed P-Safe operating pressure on any system. Respondent will repair all defects identified through the reevaluation on a schedule, to be submitted to the Director, Western Region, OPS within 6 months of reevaluation of each pipeline system for approval, that at a minimum comports with the deadlines set out in 49 C.F.R. § 195.452(h)(4). All conditions defined in 49 C.F.R. § 195.452(h)(4)(i) through (iv) will be repaired in compliance with 49 C.F.R. § 195.422.

E. In all internal inspections after the date of this Consent Agreement, any geometry tools used by Respondent will be capable of accurate characterization of features that include dents, ovalities, wrinkles, and buckles. The tool will possess adequate sensor spacing to ensure data obtained will allow accurate strain analyses calculations. The tool will meet, at a minimum, the following specifications:

   i. Capable of detecting dents with depths of greater than .15 inches in pipelines of up to 24 inches in diameter at a 90 percent probability of detection:

   ii. Capable of detecting ovalities of less than 1.0 percent of the nominal pipeline diameter for pipelines greater than 10 inches in diameter at a 90 percent probability of detection;

   iii. Capable of characterizing dent depths to +/- 1.0 percent of the nominal pipeline diameter at 85 percent confidence;

- 8 -

iv. Capable of detecting dents with areal dimensions greater than 1.0 inch width by 1.0 inch length;

v. Possessing circumferential accuracy within +/- 1 o'clock position; and

vi. Possessing axial accuracy within +/- 1 percent of a reference point.

F. Respondent will reevaluate all internal inspections in the Pacific Operations unit since 1997 that utilized geometry tools, taking into account the tolerances of each tool used, within 6 months of the Effective Date of this Consent Agreement. Alternatively, within 5 years of the Effective Date of this Consent Agreement, Respondent will re-inspect all hazardous liquid pipelines in the Pacific Operations unit that have been internally inspected with a geometry tool since 1997 utilizing a tool that meets, at a minimum, the specifications required in the above subparagraph E.   Respondent will repair all defects identified through the reevaluation or re-inspection on a schedule that at a minimum comports with the deadlines set out in 49 C.F.R. § 195.452(h)(4).    Respondent will repair all conditions defined in 49 C.F.R. § 195.452(h)(4)(i) through (iv) and in compliance with 49 C.F.R. § 195.422.

G. Respondent will establish a documented feedback process within 3 months from the Effective Date of this Consent Agreement for approval by the Director, Western Region, OPS. The feedback process will provide accurate information from Respondent's personnel to any internal inspection tool vendor regarding the correlation of field non-destructive examinations and internal inspection tool data. The process will include procedures to perform excavations and assess pipeline conditions and anomalies in the field, and to correlate the information obtained in the field with internal inspection data. Upon approval of the Director, Respondent will comply with all aspects of the required process and its procedures.   In addition, Respondent will provide comprehensive and effective training to all personnel responsible for non-destructive testing to ensure their ability to implement these requirements.

H. Respondent will develop a uniform right-of-way stationing system that utilizes, at a minimum, girth weld position numbering to correlate internal inspection tool data with pipeline locations. Respondent will submit a proposal within 3 months from the Effective Date of this Consent Agreement for the system to be used to the Director, Western Region, OPS for approval. Upon approval, Respondent will use this stationing system to correlate pipeline locations with internal inspection tool data, cathodic protection and close interval survey data, and any other pipeline inspection data.

15. Within 60 days of the Effective Date of this Consent Agreement, Respondent will submit for review and approval by the Director, Western Region, OPS, the procedure(s)

- 9 -

that define its one-call damage prevention activities for excavations along its pipeline right-of-way(s). The procedures must include provisions to provide on-site monitoring during mechanized excavation activities in close proximity to Respondent's pipeline facilities.

16. Respondent will incorporate all work products and data resulting from Paragraphs 11 through 15, as applicable, into its Integrity Management Program procedures and manual for Operations, Maintenance, and Emergencies.

17. Respondent will create a secure, encrypted website, accessible only by OPS and its agents acting pursuant to Federal authorization, that enables access to all technical final documents, required submissions, and status of work pursuant to this Consent Agreement. Wherever applicable, information on the website will be correlated to the uniform stationing system developed pursuant to Paragraph 14H. The website will be operational within 3 months of the Effective Date of this Consent Agreement. The website will be populated with relevant data on a rolling basis, with any submissions required under this Consent Agreement being posted to the website on or before the specified deadline. Respondent may make all assertions and claims available pursuant to Section VII (Information Disclosure) regarding information posted on this website.

18. Within 30 days of the date of this Consent Agreement, Respondent will submit to the Director, Western Region, OPS, a list of names of proposed independent experts to be retained by Respondent for each task that requires utilization of an independent expert. Each expert proposed by Respondent must be qualified to carry out the applicable requirements of the task for which that expert is proposed. No expert proposed will have been previously or materially involved in the development of the activity he or she will be reviewing. Respondent will submit information sufficient for the Director to determine whether each expert possesses the necessary qualifications. After reviewing the information submitted by Respondent, the Director may approve one or more of the names submitted or disapprove any or all of the names.

**III. Review and Approval Process**

19. With respect to each submission that under this Consent Agreement requires the approval of the Director, Western Region, OPS, the Director may: (a) approve, in whole or in part, the submission, (b) approve the submission on specified conditions, (c) disapprove, in whole or in part, the submission, or (d) any combination of the foregoing. In the event of approval, approval in part, or approval upon conditions, Respondent will proceed to take all action required by the submission as approved by the Director, subject to Respondent's right to invoke the dispute resolution procedures in Section VI with respect to any conditions identified by the Director. In the event that the Director disapproves all or any portion of the submission, the Director will provide Respondent with a written notice of the deficiencies. Respondent will correct all deficiencies within the time specified by the Director and resubmit it for approval. In the event that a

MAR-29-06  10:16        202 366 7041                    P.13      R-139      Job-927
    3-29-06:11:09AM:                                                    :202 366 7041        # 13/ 30

resubmitted item is disapproved in whole or in part, the Director may again require Respondent to correct the deficiencies in accordance with the foregoing procedure, subject to Respondent's right to invoke the dispute resolution procedures in Section VI.

### IV. Force Majeure

20. Respondent agrees to perform all terms of this Consent Agreement within the timeframes established under this Consent Agreement, unless performance is delayed by a force majeure. For purposes of this Consent Agreement, a force majeure is defined as any event arising from causes beyond the control of Respondent, or any entity controlled by Respondent or Respondent's contractors, which delays or prevents performance of any obligation under this Consent Agreement despite Respondent's best efforts to fulfill the obligation. Force majeure does not include financial inability to complete activities required under Section II (Work to Be Performed), increased cost of performance, or changes in Respondent's business or economic circumstances.

21. If an event occurs or has occurred that may delay the performance of any term of this Consent Agreement beyond the approved timeframe, whether or not caused by a force majeure event, Respondent shall verbally notify the Director, Western Region, OPS within 5 business days of when Respondent knew or should have known that the event might cause a delay. Such notice shall identify the cause of the delay or anticipated delay and the anticipated duration of the delay; state the measures taken or to be taken to prevent or minimize the delay; and estimate the timetable for implementation of those measures. Failure to comply with the notice provision of this paragraph and to undertake best efforts to avoid and minimize the delay shall waive any claim of force majeure by Respondent. Respondent shall be deemed to have notice of any circumstances of which its contractors had or should have had notice.

22. If the Director, Western Region, OPS determines that a delay or anticipated delay in performance is or was attributable to a force majeure, then the time period for the performance of that term will be extended as deemed necessary by the Director. The Director will notify Respondent, in writing, of the length of any extension of performance of such terms affected by the force majeure. Any such extensions shall not alter Respondent's obligation to perform or complete other terms of this Consent Agreement which are not directly affected by the force majeure.

### V. Stipulated Penalties

23. In the event that Respondent fails to comply with any requirement of this Consent Agreement, Respondent shall be liable for stipulated penalties unless a force majeure event has occurred and PHMSA has approved the extension of a deadline, in accordance with Section IV (Force Majeure). Compliance with this Consent Agreement by Respondent includes completion of any term of this Consent Agreement within the timeframe approved under this Consent Agreement.

- 11 -

24. The following stipulated penalties shall be payable per instance of failure to comply per day:  $1,000 per day for the 1st through 10th days of noncompliance; $5,000 per day for the 11th through 30th days of noncompliance; and $10,000 per day for each day of noncompliance thereafter.  Penalties shall begin to accrue on the day after performance is due and shall continue to accrue through the final day of completion or correction of the activity.  Payment shall be due within 30 days of receipt of a demand letter from PHMSA. Nothing herein shall prevent the simultaneous accrual of separate stipulated penalties for separate instances of noncompliance with this Consent Agreement.  With respect to any noncompliance which is contested in accordance with the dispute resolution procedures set forth in Section VI of this Consent Agreement, stipulated penalties shall continue to accrue as provided in this Paragraph during dispute resolution, but need not be paid until the resolution of the dispute in accordance with that Section.  In such event, all stipulated penalties due shall be paid within 15 days of the issuance of the determination by the Director, Western Region, OPS, or if that determination is appealed to the Associate Administrator, within 15 days of the decision of the Associate Administrator.  In the event Respondent prevails in a claim subject to dispute resolution under Section VI of this Consent Agreement, Respondent shall not owe any stipulated penalties based on such claim.

25. Respondent shall make payments of any stipulated penalties by wire transfer through the Federal Reserve Communications System to the account of the U.S. Treasury in accordance with the procedures PHMSA has established under 49 C.F.R. § 89.21.  Upon making a payment, Respondent shall send a separate notification of that payment to the Chief Counsel, Office of Chief Counsel, PHMSA, U.S. Department of Transportation, Room 8417, 400 7th Street SW, Washington DC, 20590.

26. Payments of penalties shall not alter Respondent's obligation to comply with the terms and conditions of this Consent Agreement.  The stipulated penalties set forth herein do not preclude PHMSA from pursuing any other remedies or sanctions which may be available to PHMSA by reason of Respondent's failure to comply with the Consent Agreement.

**VI. Dispute Resolution**

27. PHMSA and Respondent will informally attempt to resolve any disputes arising under this Consent Agreement.  Respondent and a lead inspector to be designated by the Director, Western Region, OPS will first confer in an effort to resolve the dispute.  If Respondent and the lead inspector are unable to informally resolve the dispute within 15 days, Respondent may request in writing, within 10 days, a written determination resolving the dispute by the Director, Western Region, OPS.  The request will provide all information that Respondent believes is relevant to the dispute.  If the request is submitted as provided herein, the Director will issue a determination in writing. Respondent shall notify the Director in writing within 7 days of receipt of the Director's

- 12 -

MAR-29-06  10:16     202 366 7041                   P.15      R-139    Job-927
3-29-06:11:09AM:                                            :202 366 7041    # 16/ 30

determination whether Respondent intends to proceed in accordance with the Director's determination. The Director's determination shall no longer be subject to dispute pursuant to this Consent Agreement, unless within 7 days of receipt of the Director's determination, Respondent files an appeal with the Associate Administrator for Pipeline Safety. The Associate Administrator will issue a written decision after receipt of Respondent's appeal. Respondent shall notify the Director and the Associate Administrator in writing within 7 days of receipt of the Associate Administrator's decision whether Respondent intends to proceed in accordance with the Associate Administrator's decision.

28. PHMSA reserves all of its rights to seek enforcement of this Consent Agreement and/or any other appropriate relief in the event that Respondent does not proceed in accordance with the Director's determination, or if appealed, in accordance with the Associate Administrator's decision. The existence of a dispute and PHMSA's consideration of matters placed in dispute shall not excuse, toll, or suspend any term or timeframe for completion of a term imposed by this Consent Agreement during the pendency of the dispute resolution process except as agreed by the Director in writing.

## VII. Information Disclosure

29. For any deliverables required to be submitted to PHMSA pursuant to this Consent Agreement, Respondent may assert a claim of business confidentiality, or for any other protections applicable to the release of information by PHMSA, covering part or all of the information required to be submitted to PHMSA pursuant to the terms of this Consent Agreement. The claim of confidentiality shall be in writing, shall accompany the submission of information to be covered, and shall include a statement specifying the grounds for the claim of confidentially. If Respondent has submitted such claim accompanying the submission of information, PHMSA shall consider the claim as a statement of objection to release of the information. PHMSA shall release information submitted pursuant to this Consent Agreement only in accordance with 49 C.F.R. Part 7, the Freedom of Information Act, 5 U.S.C. § 552, and other applicable regulations and Executive Orders.

30. Respondent may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Respondent asserts such a privilege in lieu of providing documents, Respondent shall provide PHMSA with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the author's name and title; (4) the name and title of each addressee and recipient; (5) a description of the contents; and (6) the privilege asserted by Respondent. However, no documents, reports, data, or other information required to be created or submitted to PHMSA pursuant to the requirements of this Consent Agreement shall be withheld from PHMSA on the grounds that they are privileged.

- 13 -

31. Nothing in this Consent Agreement shall be construed to limit PHMSA's right of access, entry, inspection, and information gathering pursuant to applicable law, including but not limited to the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, or regulations promulgated thereunder.

## VIII. Timeliness

32. Unless otherwise specified herein, all actions, decisions or determinations required to be undertaken pursuant to this Consent Agreement shall be made in a timely manner.

## IX. Effective Date

33. The "Effective Date" as used herein is the date on which this Consent Agreement has been signed by both Respondent and PHMSA. Unless specified to the contrary, all deadlines for actions required by this Consent Agreement run from the Effective Date of the Consent Agreement.

## X. Termination

34. This Consent Agreement shall terminate upon the completion of all terms set forth in Section II (Work to Be Performed). Respondent may request written confirmation from PHMSA when this Consent Agreement is terminated. Further, prior to termination, but not earlier than 5 years after the Effective Date, Respondent may request confirmation from PHMSA that all of the requirements of Section II (Work to Be Performed), with the exception of those set forth in Paragraph 13, have been completed by Respondent.

## XI. Ratification

35. The Parties hereby agree to all conditions and terms of this Consent Agreement:

For PHMSA:                                    For Respondent:

Stacey Gerard                                 Thomas A. Bannigan
Associate Administrator                       President, Products Pipelines,
for Pipeline Safety                           Kinder Morgan Energy Partners

MAR 2 9 2006                                  April 4, 2006
_____                               _____
Date                                          Date

- 14 -